Company, and we'll begin with Larry Mobley. You actually got it right the first time. Good. Go for it. May it please the court, Larry Edward Mobley on behalf of Church Mutual Insurance Company, and I'm not here to regurgitate a brief to you guys. You guys have the paper. I can tell you my perspective of it from being on the ground. Well, let's start with the jurisdiction question we asked, though, because we asked for y'all to tell us what was in the record at the district court, and that isn't what you gave us, so can you please tell us that? Yes, Your Honor. I can certainly tell you that. Church Mutual Insurance Company, SI, is a wholly owned entity formed in Wisconsin. No, I mean, I'm aware of what you're saying to us, but the point is, and we have case law on this, that it needs to be in the record in the district court, so the fact that you come and tell us right now, I appreciate that, but that isn't the same thing as pointing to ROA 622. No, I understand that, Your Honor. I think the issue is it was poorly pled in the original complaint. I mean, I think it's paragraph 28 of their complaint before you get to the amount and controversy issue, the actual amount where they're talking about the damages that they allegedly suffered. I don't think they do an adequate job of pleading the actual entity itself in the original complaint. I think that's paragraphs four through eight, but as far as it being pled, it was not addressed by the lower court, so it was a case under 1332. So, I mean, if it wasn't pled, that falls on the plaintiff in this matter. They've got to establish jurisdiction. I don't have to establish. Oh, I'm well aware, but I think you know that I will ask them that, but you're the first person talking, so I'm asking you. I understand, Your Honor. Because both of y'all sent letters, so . . . Yes, yes, and I'd like to . . . You're not contesting that y'all have diversity. No, I'm not contesting that, Your Honor.  It brings up the larger issue that's the crux of this case in my estimation. I'm a ground pounder. I'm the one in the district court. I rarely grace this courtroom, and the thing that annoys me is whenever I don't get the documents I need to either defend or to say, tell my client, settle this case, and that's what happened here. It all starts with Federal Rule of Civil Procedure 1. That rule is rarely cited, but it tells how the rest of the rules are to be implemented, interpreted, and understood as you proceed through the course of litigation. It says speedy, effective, and just, and whenever I get a case that's governed by a case management order, it tells me that Plaintiff is supposed to cooperate, produce me documents, and I can evaluate the case. They fail to do so. A year later, or over a year later, we subpoena the state fire marshal because we know there might be other stuff out there. We get a contract from Hero Construction. Hero Construction, we subpoena them. We get their documents. Then we end up deposing them in October of 2023, and lo and behold, they've got invoices that total a little less than $900,000. Well, all this while, Plaintiff has been sitting on these documents, I mean appellee, I'm sorry, has been sitting on the documents. They have an obligation under Rule 26, under Rule Section D and E of the case management order, which is on record on Appeal 50 and 51, to provide these documents, supplement us with the documents. Now, we certainly can consider discovery on appeal, but this is something that we very much defer to district judges on because they're the ones dealing with the la, la, la, issue by issue by issue. What is it that you think is bad enough that the district court did on this point that it makes sense for the appellate court to consider? No, I understand, Your Honor. I think it boils down to two things, really. One is there's an irrevocable assignment that we uncover. They try to renounce it five days before trial. We try to join Hero Construction because they have the assignment. All of that is denied. I'm not even allowed to present this evidence to the jury that there's an assignment, that the amount of the contract is almost a million dollars less than the appraisal award that they are allowed to present to the jury. Then we get the invoices that we defend its proffer for, and it's less than a million dollars in work that has actually been performed. The only testimony about it is that the work is eighty-five percent complete. That feeds into, if I don't have the documents, how am I in bad faith? They're the ones that hid the documents, that failed to produce the documents. They had counsel by October 31st of 2020. That is two months and four days after Hurricane Laura. They had counsel. Counsel knew the obligations. I wouldn't fault the plaintiff, but that they had counsel and failed to provide me with the documents. By the time they filed suit, they knew what was going on. It's frustrating to me, but then I'm not allowed to show the jury the assignment. What's the exact abuse of discretion in this whole discovery arena? The full abuse of discretion is the court not allowing me to present the evidence to the jury. I wasn't allowed to present the actual damages that the plaintiff had sustained. Three months prior to this case, Your Honor . . . Counsel, did you raise an issue regarding discovery in the briefs? I don't recall one. We did raise it. We raised it via the not being allowed to make the proffers. What happened is that because we discovered it so late, the district court abused its discretion by not allowing us to present it to the jury. That's why we had all these proffers. I've never proffered anything in federal court before until this trial. We had to proffer the assignment, the actual invoices. Three months before this, Judge Cain in Christopher v. Great Lakes says that estimates are great and that is . . . basically, that's the best we got, unless you got actual repair invoices. We finally get the repair invoices and we're precluded from preventing them, and those are a defendant's proffer for. You're complaining about the district court's failure to admit this evidence versus the other side's failure to produce it before the time it produced? A little bit of both, I guess, is the best way to put it. Which issue did you raise in your brief? The issue I raised in the brief was not being allowed to present it to the jury for them to evaluate it and make an actual determination. The argument you were making to me sounded like discovery. That's why I asked it. Oh, no. I understand. It kind of feeds into one and the other. The issue was at the district court was that it came up so late that it would have delayed the lower court proceeding, and that is how it fed into us having to proffer. I mean, there's a multitude of issues in this case. Well, let me ask you about one of them that you mentioned a little bit or just talked about, which is this whole hero construction thing. Y'all didn't agree to that, so there was no assignment to them of your insurance? Well, I think the policy is pretty clear, or it has been in the past, that they didn't seek our consent. Right, and y'all didn't. We didn't know about it. Okay, so then it's not an assignment. This whole thing that is being discussed about that is not in play, right? No, I think it is in play because we don't want to have to . . . I mean, what's to say hero can't come back and sue Church Mutual based on this assignment? Let's say we pay them. It's almost like an interpleader action at this point. Until there's a legal determination made at the district court level as to whether that assignment is valid and enforceable or not valid and enforceable, I don't even know who we should pay. I mean, there's nothing to prevent hero . . . Yeah, but I mean, if you owed me $100 and I owed Judge Ramirez $100, that wouldn't mean that you need to give her the $100. Unless you guys had an agreement that if I paid you, you would pay Judge Ramirez. Well, but that would be exactly between us, not you. Right, but if Judge Ramirez is accepting that based on the predication that I'm going to pay you, and that is what they allege in their brief happened here, that they were enticed into this, that hero construction was, based on the predication that I'm going to pay Your Honor, and Ramirez is enticed into that, I might have a problem later on down the road. I mean, it is my issue. I don't see why that's your problem. It might be mine, but I don't see why it's your concern. Well, it could be. I mean, Judge Ramirez may sue me. Okay. Well, whatever. I don't understand why that's something that they should be a party in the case when they haven't sued you, and they haven't claimed they should sue you, and they're just sitting around waiting for the money to come. Right. And it will, I guess. Maybe it hasn't yet, but it will if you hadn't appealed based on the win in the trial, and if you lose the appeal. I guess the larger issue is why I wasn't allowed to present this to the jury. I mean, that . . . Why does it matter to the jury? Why does it matter to the jury? Because the judge, like I said three months earlier, said that the invoices were the best evidence of the amount of damage. Judge Cain, the district court judge, said that. Three months later, I'm not allowed to submit those invoices to the jury. That is the largest issue in my book. The assignment is the assignment. I guess it will all work out in the wash, but not providing the documentation of repair costs? That's a big issue in a case like this. I mean, you go from a five million dollar, over five million dollar appraisal award to a $4.4 million contract to less than a million dollars in actual repairs, and then they stack the bad faith on top of all of that without me ever knowing or allowing to present to the jury that this is how much they've spent? I'm a little confused. As I read your issue, you were contending the district court abused its discretion by refusing to allow evidence of the assignment. What you're talking about now is evidence of damages, which seems to me to be a different issue. Which is it? It's more, it's a little bit of both actually. The assignment is an issue because of what we talk about, the potential for another claim, but the damages also were precluded at the trial level, and that's Defendant's proffer four. If you have anything . . . Okay, I have one question that's a little bit different. If we did affirm the rest, and then we would get to the attorney's fees issue, it sounds like both of you think we should send it back, except for different reasons. Do you agree with them that we should send it back for the, if we affirm the rest of it on the appellate, on the appeal money that the attorney has, or do you think it's only to send back on your thirty versus thirty-three percent issue? I think it needs to be sent back to retry. I mean . . . On the attorney's fees? On the whole thing. No, I understand that. I'm saying if we affirmed everything else, and I know you don't want us to, and I'm not saying we will. I'm just saying if, then I'm asking about the attorney's fees, so answer that question. Yeah, I mean, I think it will be . . . I think generally the running thing has been thirty percent, but I mean, I don't know if there would be amenable to that or not, so . . . Okay. I know it's hard for you all to answer if questions that you don't like, but that is what we do. Thank you. Thank you. May it please the Court, Thomas Flanagan on behalf of First Assembly. Your Honor, I know that you've asked this question about jurisdiction. I want to start there. Let's start there. The record is not pristine, and first I want to apologize for not reading the Court's directive more carefully and giving information rather than pointing to where it is in the record. The best I can do is to point to the first amended complaint for damages where the Church identifies itself as a non-profit religious corporation domiciled in Louisiana. The record will show as well that the Leesville facility was the only place of business, or I shouldn't say business for a church, operations for this particular corporation. It's where the pastor who was making the decisions at the time resided and worked. As for Church Mutual, it's alleged and admitted that it's domiciled in the state of Wisconsin. Plaintiff's Exhibit 1, page 1 points out that its home office is in Wisconsin. I understand that that's not ideal, but that's the state of the record. I'll move on now, and let me just address . . . And the district court did not ask questions about the jurisdiction, right? Did not. Okay. So there's no, like, evidence from some discussion with the district court? I don't recall. That's what we sometimes miss. Yes, Your Honor. All right. Before I get into some of the evidence and some of the particular issues, I wanted to talk about the HERO contract and not the assignment piece. I'll get into that a little later, but this notion that the HERO contract was discovered late in the day. It was admitted without objection as Plaintiff's Exhibit 4. So there's no discovery issue in this case. The briefs don't identify a discovery issue. For purposes of appeal, there were discovery issues during the course of the case, as is common. But again, nothing pending on appeal. That's why I asked him when it sounded like he was talking about discovery. It did indeed, and nothing in these briefs. It's certainly not presented to this court. I'll talk about a couple of issues first, just very briefly, why the jury's decision on property damage was not clear error. I want to talk about bad faith. There was some discussion about bad faith as well. And then if we have time, in terms of the matter of the HERO contracts and some other issues raised in brief. Of course, throughout it all, I stand ready to answer your questions. As tried, this case really wasn't a liability dispute at all. Well, how do you respond to his argument that sort of mixed discovery with the assignment? What's your response to the fact that you waited until the last minute to come running in with a bunch of stuff and kept it out of the jury and all of that? Well, Your Honor, they had the contract. They subpoenaed HERO itself several months before trial. They had the contract. The church didn't have a copy of it, just didn't have good record keeping. They learned about it from the state fire marshal, where there was a recognition of the contract. They subpoenaed HERO. I believe it was in March of 2023. They say, as for the assignment, they actually acknowledged that they got the assignment, they say, nine months after it was signed. Nine months from September of 2022 would have been July of 2023, several months before trial. And they asked the judge to let them join HERO in the case five days before the jury trial was to begin. As has been noted, there was no consent by the insurer for this assignment of rights. Its policy specifically says there can be no assignment of our rights without our consent. And that's a link to Article 2653 of our Civil Code in Louisiana. It says that when you have an agreement with a provision like that, it's enforceable. And here there has never been any consent. The proffers showed that it was rescinded anyway, and that if it weren't successfully rescinded, the parties went to the trouble of assigning back any particular rights that they had. So they went at this every way that they could to say it was never our intent that we would transfer the rights to this case. And there was never any suggestion that HERO thought it should be standing in court and making these arguments. After all, the assignment piece was specifically called a conditional assignment. It really was a method of security devices to make sure that they got collection. So you see it the way I asked about if you owed me a hundred and I owed a hundred to Judge Ramirez, that those are two sort of separate . . . That's absolutely right. Even if I told Judge Ramirez I can only give you a hundred dollars if I get it, you know . . . It would be right. We were powerless . . . Plan again. We were powerless to transfer those rights without their consent. They never consented. The parties unwound it anyway. Yeah, and I want to be clear. None of y'all owe me a hundred, and I don't owe Judge Ramirez a hundred. I understand. And I'm not suing anyone. That'd be bad for collegial relations. Exactly. So as I was mentioning, this wasn't really a liability case. This was a how-much case. And in fact, it was conceded in both opening and closing, but as to closing, Church Mutual, do we owe money? Yeah, we do. Right now, I've got two experts to say we owe 1.6 between 1.7 and change, whatever it is, and yet they paid about $461,000. So there was never a doubt that they owed some money. The verdict tracks the appraisal award in this case, and that appraisal award is presumed correct. In brief, Church Mutual says that the court shouldn't have instructed the jury in the way it did on the appraisal award, but the court did not tell the jury that the appraisal award was binding. In fact, in the jury instructions, it told them that it could be overcome, but that Church Mutual had the burden to displace it. And in fact, if the appraisal award had been binding, we really wouldn't have had a trial at all. It would have been a summary judgment. That would have been easier. Would have been much easier. Church Mutual's theory was that— For both sides. That's right. Because everybody's got to pay for attorneys and so on. That's right, Your Honor. So the theory was that this interior water damage that was so expensive to repair was caused by poor maintenance, old age, things of that sort, not the hurricane. But Church Mutual's own expert, Mr. Vanderstein, an engineer, the Church's expert, Mr. Nelson, also an engineer, found storm damage to roofs. And Mr. Vanderstein in particular, he found storm damage to the main church and the school, saying that it led in water. He was very specific on the school, where he said, yeah, the part of the roof just above the cafeteria failed and there was a lot of water in the cafeteria. So the jury had plenty of evidence from which they could decide there were storm-created openings caused by Hurricane Laura. I want to talk about bad faith and why that was not any sort of clear error on the jury's part. The court's already addressed in First Baptist Church of Iowa that this is a flexible concept, that there's no particular need for a certain form. And the court has said, both in that case and earlier in Gruletta, that an insurer's failure to pay amounts undisputedly owed is by definition arbitrary, capricious, and without probable cause. And again, I want to go back to some admissions. And I don't say this to be critical of Church Mutual. It was a very good strategy to get in front of this issue and to maintain their credibility with the jury. But they acknowledged in closing, I knew walking into this thing we owed a million bucks. Again, they had paid $461,000. I had the earlier quote, do we owe money? Yeah, we do. Referencing the experts, Mr. Vander Stein and Mr. Jones both called as witnesses. One of them said the damages were $1.7 million, the other $1.6 million. And then this one, which is very on point, is there late payments? There probably is. And continuing, I mean, like I said, I'm not going to lie to you. And that's at page 10966. So it's hard to imagine a clearer case of bad faith. It's admitted based on what was owed at a minimum. We know what was paid was a small fraction of that. There was a recent case, First United Pentecostal, where there was a bench trial and a finding that in that case, there was not bad faith. It's a very different case. The fact that there was a bench trial allowed this court to review the court's reasons and to determine the court failed to grapple with particular issues. But here, the jury was properly instructed. In fact, the instructions were very fair to this insurance company, talking about reasonable doubts and the need for investigation. So there's no complaint on the other side about jury instructions on this question of bad faith, other than the writing requirement, which we've already addressed. But here, the jury could have determined that the claimed need for experts was pretextual. And that's because when Church Mutual had expert opinions from Mr. Vanderstein and Mr. Jones, for example, they ignored them. They went into court saying, yeah, I know we've got these experts to say we owe 1.6, 1.7 million, having paid about 25% of that. Conversely, they had a consultant, Sedgwick, who supplied their outside adjuster, tell them, and they say this at their brief on page nine, Sedgwick recommended they actually pay less than they did on the mooring invoice. Sort of makes them look generous, except it's another example of not following the experts. Had they followed what their experts said to the letter, they would have had a much stronger argument. But instead, time after time, they failed to acknowledge and respect what the experts said. I think that we've discussed HERO. These are all issues relative to the abuse of discretion standard. There's been no showing of an abuse. There was a discussion in brief about the principle of HERO construction, a man named Chad Hebert, who was not called as a witness at trial. The other side says that they couldn't then present their testimony. Well, they never offered it. They did proffer various receipts. They never offered it and had it rejected. But what they could have done when Mr. Hebert was not available, he went on a hunting trip during the trial, which is an occupational hazard in Louisiana. They had his deposition and yet they never offered his deposition. They could have played his deposition, which they had taken just the month before. There's discussion in brief again concerning some deposition testimony of a corporate representative, a lady named Lynn Renlund. The issue here is that Church Mutual introduced her testimony. Church Mutual had control of the videotape, so to speak. The parties had given each other designations, but in terms of processing those, there'd been no further communication. There had been a discussion with the court and the court stated that he thought that there had been an agreement that certain portions of the deposition would be played to the extent there was any hot mic portions of the colloquy where the zoom was continuing and Ms. Renlund was speaking about her views of Louisiana laws and the unreasonableness of a 30-day period. The judge thought that would be out. Thought there was an agreement and he so said on the record. Notwithstanding that, Church Mutual played the deposition and immediately after playing the deposition, which was on day four of the trial, said we move for a mistrial. That the testimony that we presented goes far beyond what we discussed, but they were in control of the videotape. They were the only ones to press the button and to play the testimony. So the doctrine, and we cite the Blessing Marine case, a party evidence on appeal, but in any case, this would be a discretionary decision with the trial court. And then finally, in terms of attorney's fees, we're not challenging what the district court did in terms of the fees for trial court work, but we do say and we've assigned as a particular point, as a special issue in our brief, that we think that we ought to be given an opportunity. The preferred procedure of this court, as said in Zimmerman, is to remand to the district court. Yeah, but your opponent is challenging the 30 versus 33.3%. What's your reaction to that? Well, and I acknowledge the judge did use both numbers, but when he actually entered his award, he used 33.3% to the extent that typically appeals are from judgments and not reasons for judgment or explanations of judgment, but if there is any confusion, we wouldn't oppose a remand on that, along with our remand for additional fees on appeal. In fact, when we asked for fees in the trial court, our opponent said, some of your contingency fee is for work on appeal. We've not been on appeal yet, so this is premature. And so, well, now here you are. Here we are. And so, unless there's any further questions, I'll yield back my time. I have a question. Given the not pristine record on jurisdiction, is a limited remand appropriate for purposes of allowing the district court to address jurisdiction in the first instance? Your Honor, I appreciate the question, and I know how careful this court is and has been for many years on jurisdiction, and I do think that would be appropriate. Thank you. Thank you.  All right. We'll hear the rebuttal from Mr. Mobley. I'm going to take his argument kind of in reverse order. He was talking about Lynn Renlund. Lynn Renlund had a medical procedure, so we took a trial deposition. The hot mic issue that he's talking about was when the Zoom was recorded. But after we got back on the record, there was a recross, so there was a direct, a cross-examination, a redirect, and then a recross. We objected to the entirety of the recross. It's in the record. We objected to it multiple times. That was the portion that the court required us to play that we found objectionable. We objected at the beginning of trial. We objected during the deposition of the entirety of the recross. In fact, there was a standing objection to the recross that was never ruled on by the district court. The Chad Ehrbacher thing from Hero Construction is kind of interesting because he was listed as a willful witness. I'm sure you guys saw it in the record, for the plaintiff. He was to testify on the day that we sought to subpoena him, so that he suddenly had a hunting trip whenever he was supposed to be in court on plaintiff's behalf begs another question. That's how this trial went. You're right, the record is not perfect. The mooring, to say the gate for the mitigation. Then we had Sedgwick go through the invoices. They said that $85,000 was for catering and equipment runoff, which is not covered under the insurance policy. I think we . . . As far as . . . I find it interesting that opposing counsel states that the jury had sufficient evidence to make its determinations. The real question is, they didn't have all the evidence. He says that the jury instructions were fine, it's presumed accurate, but if you know the actual amount versus what somebody comes up with in exact amount, okay, I want a new house. It's going to cost you a million dollars to build a new house. You hire another contractor, it only costs them half a million dollars to build a new house. What is the true cost of building that house? That's really what we're talking about. They had a duty under the federal rules, under the CMO, under the insurance policy upon which they're suing on to provide us with the documents. The opposing counsel is standing up here saying they had shoddy recordkeeping. They're the ones that filed suit. They're the ones that hired attorney two months and four days after Hurricane Laura. They're the ones that had . . . the insurance company had to deal with. It's counsel. No longer are they insured. To sit here and blame the church for having shoddy recordkeeping whenever this whole thing is controlled by counsel is a huge issue for me. The bad faith, I don't know how we can be in bad faith whenever they're not providing the information that they're required. Unless the court has any questions, I'll try not to bore you anymore. Well, we appreciate both sides' arguments and the cases under submission. We are going to take a very short break between this and the next argument, just about five minutes.